(128 App. Div. 780.)

BUSHTIS v. CATSKILL CEMENT CO.

(Supreme Court, Appellate Division, Third Department. November 25, 1908.)

1. MASTER AND SERVANT (§ 204*)—ASSUMPTION OF RISK.

Defendant operated a cement mill, and plaintiff was employed in the clay room. Into this room clay was brought by an elevated railroad and dumped upon the floor. Near the place where the clay was dumped there was an opening in the floor, a little over 2 feet long and about 16 inches wide, and underneath this opening a box led down to a couple of iron rollers used for grinding the clay. A short distance from this opening was an elevator used to carry the clay to a drier after it was pulverized by the rollers. The opening in the floor was unguarded, and plaintiff, who had been employed at the work for about two years before he was injured and was shoveling the clay into the opening in the floor leading to the rollers, was injured by the falling of a lump of clay from the elevator, which hit him on the head, knocking him down and causing him to fall through the opening upon the rollers. *Held*, that plaintiff assumed the risk of falling into the opening in the floor, and his assumption of the risk is not affected by Factory Act (Laws 1897, p. 480, c. 415) § 81, making the failure of the defendant to guard the opening a criminal offense.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 545; Dec. Dig. § 204.*]

2. MASTER AND SERVANT (§ 14*) — MASTER'S LIABILITY FOR INJURIES—STATUTORY PROVISIONS.

Factory Act (Laws 1897, p. 480, c. 415) § 81, making it necessary for a master to protect openings and other dangerous places by guards, is an extension of the common-law liability, and therefore is to be construed strictly, in the light of public policy.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 14.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MASTER AND SERVANT (§ 204*)—MASTER'S LIABILITY FOR INJURIES—STATU-
   TORY PROVISIONS.
       Where the Legislature by statute extends the common-law liability of
   a master, the presumption will be that the limit of that extension is ex-
   pressed in the statute itself, and the amendment of the factory act (Pen.
   Code, § 384l, amended by Laws 1897, p. 505, c. 416, § 3), which made a fail-
   ure to comply with its provisions a crime, but which does not provide that
   an employé was not to be deemed to have assumed the risk inherent to
   any defect which in itself is a violation of the act, will not be construed
   as doing away with the employé's assumption of the risk.
       [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 545;
   Dec. Dig. § 204.*]

4. MASTER AND SERVANT (§ 288*)—ACTIONS FOR INJURIES—QUESTIONS FOR JURY
   —ASSUMPTION OF RISK.
       Employer's Liability Act (Laws 1902, p. 1750, c. 600) § 3, providing that
   the question of assumption of risk shall be for the jury, does not apply to
   an action brought by a servant, where no notice of the time, place, and
   cause of the injury is alleged in the complaint to have been given, as pro-
   vided for in section 2 (page 1749) of that act.
       [Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 288.*]

       Kellogg, J., dissenting.

Appeal from Trial Term, Greene County.

Action by Joseph Bushtis against the Catskill Cement Company for
injuries to plaintiff while in the employ of defendant. No notice of
the time, place, and cause of plaintiff's injury was alleged in the com-
plaint or proved to have been given, and section 2 of Laws 1902, p.
1749, c. 600, known as the "Employer's Liability Act," provides that
no action for injury "under this act" shall be maintained unless such
notice is given to the employer. From a judgment dismissing the
complaint, plaintiff appealed. Affirmed.

       Appeal by plaintiff from a judgment entered in the clerk's office of the
county of Greene, 6th of May, 1908, dismissing plaintiff's complaint.
       The defendant was operating a cement mill in the village of Catskill. In
its factory is what is known as the "clay room." Into this room clay is
brought upon an elevated railroad structure and dumped from the cars upon
the floor. This railroad is about 12 feet above the surface of the floor. As
the clay is dumped upon the floor, as one load falls upon another, the pile of
clay at the bottom is necessarily enlarged, so that it extends at times 11 or 12
feet to either side of the central point below where the car is dumped. South-
westerly of this place of dumping is the clay machine. That clay machine
consists of a couple of iron rollers set about 10 or 12 inches below the floor,
which rollers are set close together and are turned so they revolve toward each
other. The iron rollers have small iron bars set at intervals around the cir-
cumference. The clay machine is used for grinding and disintegrating the
clay as it comes into the mill in its natural state. Around the iron rollers of
the clay machine is an iron box, which extends from the surface of the floor
down to the rollers, which are located about 10 or 12 inches below the floor.
The iron box is about 2 feet 2 inches long and about 16 inches wide. The
opening in the floor to this clay machine was unguarded. Immediately west
of the clay machine is an elevator. This elevator consists of cast-iron buckets
riveted between two strands of chains. These chains are about 10 inches
apart, and pass over sprocket wheels at the top and under sprocket wheels at
the bottom. The buckets of the elevator are 5 inches wide by 8 inches long
and 4 inches deep. The elevator runs through an opening in the floor up-
wards at right angles with the floor to a height of about 10 or 12 feet above
the floor. The buckets of the elevator carry the pulverized clay crushed with
the clay machine to the height of about 10 or 12 feet and then dump the crush-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ed clay into a shute leading into the drier. The duty of the man employed at the clay machine is to shovel or dump clay into the clay machine, and he stands on the northerly side of the clay machine, between the clay machine and the clay dumped by the cars. The pile of clay brought in and dumped by the cars varies in height. When up to the bottom of the track it is about 10 or 12 feet high, and at times the base of the pile would be within 10 or 12 inches of the clay machine. There was no boxing around the elevator to prevent lumps of clay from getting into the bucket of the elevator at the time the plaintiff was hurt.

This plaintiff was a common laborer. He had been employed at this work for about two years, and he had shoveled the clay from the pile of clay in the clay room into the opening in the floor leading down to the clay machine. Upon the day in question it is claimed that a lump of clay rolled into the elevator shaft, was carried up in the bucket, and fell off, hitting the plaintiff upon the head. By the force of the blow he was knocked down, and fell into this clay machine, by which he was injured, and it is for these injuries that he has brought this action. Upon the trial the plaintiff was nonsuited, upon the ground that the risk was open and visible, and was assumed by the plaintiff. Judgment was entered upon this nonsuit, and from this judgment this appeal is taken.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

Duntz & Herzberg, for appellant.

Osborn, Bloodgood & Wilbur (F. H. Osborn, of counsel), for respondent.

SMITH, P. J. It is difficult to see how reasonable prudence could have dictated to the defendant additional guards to its machinery. The opening in the floor leading to the clay machine could not have been guarded, because there was continual necessity of an open way into which the clay could be thrown into the machine. It is suggested that a rail might be put up to prevent the man there at work from falling in. It would require extraordinary foresight, however, to anticipate that a man with a thorough knowledge of the existence of the opening should be stepping into the machine, or that a lump of clay should in this mysterious way have been carried up by the elevator buckets and fallen upon him, knocking him into the machine. Moreover, the size of the buckets in the elevator would seem almost to negative the possibility of an accident occurring in this way, so that it would require great liberality in the courts to allow a verdict to stand upon the ground that the defendant was guilty of negligence in failing to provide guards either for the clay machine or for the elevator.

Assuming, however, that negligence might have been found in the defendant, if there be any survival of the law of assumed risk, the defendant must here be able to claim the benefit of that law. For two years this plaintiff had had a specific knowledge of the exact situation. It is true that the pile of clay sometimes crowded him near to this opening in the floor into which the clay was thrown into the clay machine. What danger was involved therein was known better to him than to any other man. To charge the defendant with liability for a defect of which he had the better knowledge would be to require the defendant to take better care of the plaintiff than the plaintiff is required to take of himself.

While it is difficult to see how the defendant could have guarded the clay machine, which was required to be kept open that the clay might

be fed to it, it is contended that under the factory act (Laws 1897, p. 480, c. 415, § 81) the defendant has been guilty of negligence in failing to protect it by guards, and that a plaintiff with knowledge of the danger does not assume a risk from a defect which is in violation of a commandment of the factory act. This contention would seem to be answered by the decision of the Court of Appeals in Knisely v. Pratt, 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367. In that case it was expressly held that such a risk might be assumed. The contention of the plaintiff's counsel, however, is that since the decision of that case the factory act has been amended, so as to make a failure to comply with its provisions a crime; and it is argued that it is against public policy to hold that a risk may be assumed which arises from a defect the allowance of which is criminal on the part of the defendant. It will be borne in mind, however, that this statute is an extension of the common-law liability, and therefore, under well-settled rules of statutory construction, is to be construed strictly. In determining rules of common-law liability, courts very properly determine them in the light of public policy. Generally speaking, however, the public policy of the state is to be defined by the Legislature, and not by the courts. Where the Legislature, therefore, extends a common-law liability of a master, the presumption will be assumed that the limit of that extension is expressed in the statute itself. The amendment of the factory act (Laws 1897, p. 505, c. 416) which made a failure to comply with its provisions a crime, might have gone further, and have provided that an employé was not to be deemed to have assumed the risk inherent in any defect which in itself is a violation of the act. But this provision was not included in the statute, and because it was not included in the statute, and because the statute is one extending a common-law liability, I do not agree that this court should by judicial legislation extend the common-law liability of the master beyond the point to which it is extended by the statute itself. It is the right of the courts to interpret the laws and of the Legislature to enact them, and where the Legislature has assumed to act upon a question it is in rare cases that the courts should give effect to their enactment beyond what the Legislature itself has chosen to indicate.

Again, it is contended that, although this is a common-law action, the third section of the employer's liability act (Laws 1902, p. 1750, c. 600) applies, and that under that section the question of assumption of risk was for the jury, and not for the court. In O'Neil v. Karr, 110 App. Div. 571, 97 N. Y. Supp. 148, however, this court held otherwise. That case went back for a new trial. Upon the new trial the plaintiff was nonsuited in accordance with the judgment of this court. Upon appeal from that judgment we affirmed the nonsuit, and the Court of Appeals affirmed our judgment without opinion. It is claimed that, because our judgment was affirmed in the Court of Appeals without opinion, there probably were other questions upon which the case was decided. I have examined the record upon the second appeal in our court, and the appellant's brief consists of a single page, and states that the case is substantially as it was upon the first trial, and that, as the controlling question was there determined against the appellant, his only request was that there should be a dissent, that

he might take the question to the Court of Appeals. An examination of the facts of that case shows clearly that it was impossible to justify the nonsuit therein granted, except upon the construction given to the employer's liability act (Laws 1902, p. 1748, c. 600) in our decision of the case. Moreover, the case of Ward v. Manhattan Ry. Co., in the First Department, reported in 95 App. Div. 437, 88 N. Y. Supp. 758, has been expressly overruled by the First Department itself in the case of Curran v. Manhattan Ry. Co., 118 App. Div. 347, 103 N. Y. Supp. 351, and that department is now in accord with the Third Department upon the construction of section 3 of the employer's liability act.

In the case at bar the accident was an unusual one, not reasonably to be anticipated. Any attempt at guarding the machinery which caused the accident would have been to a greater or less extent an impediment to the work that was necessary to be done. The danger of getting into the hole in the floor, and thereby into the machinery, was so apparent that a child might see it.

The judgment, therefore, was properly directed, and should be affirmed.

Judgment affirmed, with costs. All concur, except JOHN M. KELLOGG, J., dissenting in opinion.

JOHN M. KELLOGG, J. (dissenting). The plaintiff is a Russian, 40 years of age, who has been in this country about 5 years, cannot speak or understand the language, and was working for the defendant as a common laborer, receiving $1.54 per day of 11 hours. He was employed in the clay room of defendant's factory, into which room chunks of clay were dumped from a car upon the floor near an opening. In this opening in the floor, 24 by 16 inches, was placed an iron box containing the clay machine, which consists of a pair of iron rollers revolving toward each other about 1½ inches apart. Each roller has small iron bars set at intervals around its circumference. The rollers revolve about 10 or 12 inches below the floor. Plaintiff's duties were to take the clay from the floor and shovel it into this machine, where it was crushed, and the crushed clay was then elevated by an elevator running through the floor near the clay machine. The elevator consisted of cast-iron boxes revolving on two strands of chain, which were about 10 inches apart, and passed over a sprocket wheel under the floor and another sprocket wheel near the ceiling. As the crushed clay fell from the clay machine, these boxes raised it from below, elevating it about 10 or 12 feet above the floor, onto a shute leading into the drier. At the time of the accident neither the clay machine nor the elevator were inclosed or guarded in any manner. The clay upon the floor near the machine, where the plaintiff was standing, was about 2 feet in thickness. Frequently, upon other occasions, clay would roll from the floor onto the boxes of the elevator, be carried up a distance, and fall out upon the floor. The plaintiff knew that if his legs were caught in the clay machine, or if a piece of clay hit him upon the head, he might be severely hurt, and he exercised great care in those respects. There is no evidence that he ever saw any other clay machine or elevator in operation, or knew how they should be constructed or guarded, or knew that it was the duty of the defendant to guard

them, or that he had any right to ask to have them guarded. It does not appear but he understood that the machines were perfect in every respect, and that nothing further could be added with a view to safety. He was evidently more or less unfamiliar with the customs and laws of the country, and probably did not know that it was criminal for the defendant to put him at work upon these unguarded machines. He began this kind of work for the defendant about two years before the accident. He was then taken to the machine, handed a shovel, and was shown how to use it. Not understanding the language, he had no conversation with the person putting him to work. He only knew what to do by seeing the overseer use the shovel. While engaged in his duties a chunk of clay fell from the elevator, hit him upon the head, knocked him down, his legs went into the unguarded clay machine, and he was severely injured. The complaint was dismissed by the court, apparently upon the ground that the plaintiff had assumed the risk of these unguarded machines.

We must assume that the clay machine and the elevator could have been properly guarded, and that the defendant, by putting the plaintiff at work upon them in their unguarded condition, was violating the criminal law. We may fairly infer that an expenditure of a dollar or two probably would have properly boxed both the machine and the elevator in such a manner as not to interfere with their efficiency and to protect the plaintiff from all injury therefrom.

Where the plaintiff suffers injury by the violation of a statute intended for his benefit, a jury may consider such violation as actionable negligence. "So in every case, where a statute enacts or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage or for the recompense of a wrong done to him contrary to said law." Marino v. Lehmaier, 173 N. Y. 530, 536, 66 N. E. 572, 61 L. R. A. 811. In that case it was held that a child under 14 years of age, employed in violation of the factory act (Laws 1897, p. 477, c. 415, § 70), could recover for an injury received in the employment, and that the defense of assumption of risk was not available.

Plaintiff had a certain right to believe that the defendant had properly equipped its factory, had complied with all the requirements of law to make the same as safe as may be, and that it was not furnishing machines for him to work upon in violation of the criminal law. The court was not justified in taking the case from the jury and determining that the plaintiff had assumed the risk of the defendant's criminal act. The plaintiff was a witness, and, in a sense, an exhibit before the jury. From what took place before them between the witness and the interpreter, and his appearance, the jury were called upon to estimate his intelligence and perceptive powers, and were to consider whether he was probably a reckless man, who had intentionally bartered away all regard for his safety, or whether he was an ignorant, unthinking man, who did not and could not realize the dangers by which he was surrounded, or suspect that the conditions were not the proper ones for the business in which he was engaged. It required no particular ability for him to determine that if his foot was caught between the rollers, or if clay hit him upon the head, he

would be hurt. His answers upon those subjects show no particular realization of the situation. It was for the jury to determine whether he had sufficient intelligence and forethought to properly connect in his mind the risks and to understand that an injury might result from a combination of various risks—whether his familiarity with the machinery and his forethought was such that he knew that anything had been omitted from the machine or elevator necessary to make them reasonably safe. It was evident that from defect of language he could not complain of conditions to his employer or suggest an improvement. He must either work in the situation furnished him or quit the job. Different inferences may well be drawn as to the intelligence and the understanding of the plaintiff, and how much or how little he was capable of realizing and did realize the situation and the dangers surrounding him. He made no express contract, and if any contract is to be implied it can only arise so far as his mind fairly grasped the situation. It was peculiarly a question of fact for the jury to determine.

The defendant, in furnishing this dangerous machine and elevator, was guilty of a crime, and its criminal act has caused the plaintiff's injury. It is against public policy to permit the court to say that as a matter of law the defendant may be absolved from the consequences of its criminal act and the loss therefrom put solely upon his employé because the latter was familiar with the machine.

The defendant seeks to shield itself by Knisely v. Pratt, 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367. There the plaintiff was injured by an unguarded machine, and it was held that he had full knowledge of its condition and assumed the risk therefrom; the court, considering it immaterial whether the duty to guard the machine arose from the common law or the statute, saying at page 379 of 148 N. Y. and page 987 of 42 N. E. (32 L. R. A. 367):

"We are of opinion that there is no reason in principle or authority why an employé should not be allowed to assume the obvious risk of the business as well under the factory act (Laws 1886, p. 629, c. 409, amended by Laws 1890, p. 753, c. 398) as otherwise. There is no rule of public policy which prevents an employé from deciding whether, in view of increased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks. The statute does, indeed, contemplate the protection of a certain class of laborers, but it does not deprive them of their free agency and the right to manage their own affairs."

That case was decided in February, 1896, the accident having occurred in 1891, and we must assume that it was a correct statement of the public policy of the state at that time. That decision was based upon the understanding at that time that the employer and employé stood upon an equality of contract, and that they solely were interested in the question whether the employé's life and limb should be risked by the plain violation of the duty charged by law upon the employer, and that consequently the question was not controlled by the public policy of the state, but rested solely upon the wishes and understandings of the employer and employé, between themselves. Since that time various enactments have been made by the Legislature for the protection of the life, limb, health, and comfort of the employé. They

prescribe that certain machinery shall be properly guarded, certain scaffolding used and certain sanitary conditions shall exist in factories. They regulate the time and manner of the payment of wages, and provide that certain persons, or persons of certain ages, shall not be permitted to work in various employments, and many other requirements are found, which indicate that the Legislature has deemed it necessary to provide for the protection of the employé, and that it cannot trust the employer alone to look to his safety. The various statutory provisions also indicate that the employer cannot disregard his statutory duties, even if the employé consents or does not object thereto. Many of these statutes contain provisions making a disregard of the duties enjoined by them criminal, to which is added the general provisions by sections 384g to 384m, added to the Penal Code by chapter 416, p. 503, Laws 1897, by which the violation of the various statutes is declared a crime.

It is unnecessary to refer to particular statutes, for the current of statutory law, both in this state, in the other states, and in the nation, proceeds upon the theory that the employé cannot select or dictate the machinery or the place of work, but must work in the manner the master requires, and that greed or want of care by the master for the safety of others makes it necessary that he be required to furnish safe machinery and healthy and reasonable conditions under which the servant is to work, and that he alone is responsible for the place and machinery, and that the doctrine of equality of contract between them in those respects has no present foundation in fact; that it is not for them to agree that improper and unsafe risks shall be submitted to, but for the state to require that conditions shall be safe so far as the business fairly permits. Finding that the employé is not able to protect himself against the master in those respects, the state has undertaken to say that certain dangers and conditions shall not be permitted. An employé, injured by the criminal neglect of duty by the master, is viewed more as the victim of the crime than as a party to it.

Before any such statutes were passed, if an employé was working upon a dangerous machine, he perhaps knew its condition as well as the master. What possible good can come to him, to the public, or to any one by declaring that the master must guard such dangerous machinery, if the statute is of no effect where the employé knows that the machine is unguarded? A man working at a machine with an unguarded cogwheel in plain sight, knows the fact, and knew the fact as well before the statute as after it; and if his knowledge absolved the master from all liability before the statute, and from the same liability after, the statute would seem to be unnecessary and a meaningless form. It should fairly be assumed that these statutes were passed for a purpose, and were intended to cure the evil which previously existed. The evil previously existing was that a man who had to work to support himself and family was compelled by force of circumstances to work at dangerous machinery, and in dangerous and unhealthy places, when his master by the expenditure of a few dollars might make the machinery safe and the place safe and sanitary. The statutes do not refer to the guarding of cogwheels or machinery where the employé did not know of the existence of the cogwheels or machinery, but in general terms requires that all cogwheels, shaft-

ing, and other like machinery of a dangerous nature be properly guarded as far as practicable. The guilt of the employer who violates the statute is the same, whether the employé knows or does not know of the existing conditions.

This kind of legislation is only justified by the fact, now well understood, that the employer and the employé do not stand on an equality of contract with reference to the machinery to be used and the place in which the work is to be performed, that the master and not the servant dictates and determines with reference to those matters, and that the employé must look to the state and not to his employer for protection. The answer, that if the employé does not like the machinery he need not work, is of but little avail. He must work to support his family, and by necessity he is compelled to use the machinery and appliances which the master furnishes him. He cannot be compelled by the criminal act of the master to unnecessarily risk his life in order that he may support his family. The broad ground justifying all these statutory requirements is that the state is interested in the health, the life, the limb, and the prosperity of all its citizens, and that the state has the right to regulate the conduct and conditions between citizen and citizen so far as public interests are concerned, and in a proper way to prevent the strong from treading upon the weak.

. In Simpson v. New York Rubber Co., 80 Hun, 415, 30 N. Y. Supp. 339, the General Term in the Second Department declared that the doctrine of assumption of risk did not apply to a case where the employer had violated a criminal statute and thus brought the injury upon the employé, for the reason that it was against the public policy of the state.

In De Young v. Irving, 5 App. Div. 499, 38 N. Y. Supp. 1089, the Appellate Division of the Second Department reluctantly concluded that the Simpson Case was overruled by the Knisely Case, and then suggested that quite probably the Knisely Case was in turn overruled by People v. Havnor, 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707, in which the constitutionality of the Sunday barbering act was sustained upon the ground that it was a matter of public interest to the state that its citizens should be strong and ablebodied, capable of self-support and bearing arms, and that such statutes were enacted for the public welfare.

In Johnston v. Fargo, 184 N. Y. 379, 77 N. E. 388, 7 L. R. A. (N. S.) 537, the employé was injured by the fall of an elevator negligently maintained in defendant's barn. The defendant relied upon an agreement, signed by the plaintiff at the time he entered the employment, releasing defendant from all damage caused by the negligence of the company or its employés. The court held the defendant liable on the ground that such agreement was void as against public policy. At page 385 of 184 N. Y., and page 390 of 77 N. E. (7 L. R. A. [N. S.] 537), the court says:

"The employer and the employed, in theory, deal upon equal terms; but practically that is not always the case. The artisan, or workman, may be driven by need; or he may be ignorant, or of improvident character. It is, therefore, for the interest of the community that there should be no encourage-

ment for any relaxation on the employer's part in his duty of reasonable care for the safety of his employés. That freedom of contract may be said to be affected by the denial of the right to make such agreements is met by the answer that the restriction is but a salutary one, which organized society exacts for the surer protection of its members. While it is true that the individual may be the one who directly is interested in the making of such a contract, indirectly the state, being concerned for the welfare of all its members, is interested in the maintenance of the rule of liability and in its enforcement by the courts. To a certain extent the internal activities of organized society are subject to the restraining action of the state. This is evidenced by the many laws upon the statute book, in recent years, which have been passed for the purpose of prohibiting, restricting, or regulating the conduct of a private business, either because regarded as hurtful to the health or welfare of the community; or because deemed, from its nature or magnitude, affected with a public interest. It has been observed that it is still the business of the state, in modern times, to defend individuals against one another, and, though the proposition is a broad one, when considered with reference to penal legislation and all legislation intended for the promotion of the health, welfare, and safety of the community, it is not without truth. It is evident, from the course of legislation framed for the purpose of affording greater protection to the class of the employed, that the people of this state have compelled the employer to do many things which at common law he was not under obligation to do. Such legislation may be regarded as supplementing the common-law rule of the employer's responsibility, and is illustrative of the policy of the state. Therefore it is, when an agreement is sought to be enforced which suspends the operation of the common-law rule of liability and defeats the spirit of existing laws of the state, because tending to destroy the motive of the employer to be vigilant in the performance of his duty towards his employés, that it is the duty of the court to declare it to be invalid and to refuse its enforcement."

In the Knisely Case the court was not quite sure whether the assumption of risk was based upon a contract between the employer and employed, or upon a waiver of liability by the employed. Since then that matter has been set at rest by Dowd v. N. Y., O. & W. Ry. Co., 170 N. Y. 459, 63 N. E. 541, which holds that the assumption of risk is a matter of contract and should be pleaded as an affirmative defense. The situation then since the Knisely Case has changed by the more recent determination that the assumption of risk is purely a matter of contract between the parties, and by the later developed public policy of the state, which recognizes that it is against the interest of the state to permit any contract between the employer and the employed to destroy the motive of the employer to be vigilant in performing his duty to his employés.

The recent case of Graves v. Stickley Co., 125 App. Div. 132, 109 N. Y. Supp. 256, in the Fourth Department, recognizes this change in the public policy of the state and considers the question as an open one whether an employé can contract away the benefits which the statutes intended to throw around him.

In Klein v. Garvey, 94 App. Div. 183, 87 N. Y. Supp. 998, by a unanimous court, the Appellate Division in the First Department, in May, 1904, determined that, in view of the violation of the statute, it was a question for the jury, and not for the court, to determine whether the plaintiff knew and assumed the risk.

In Johnston v. Fargo, above, the court at pages 382, 383, of 184 N. Y. and page 389 of 77 N. E. (7 L. R. A. [N. S.] 537), cites several cases in other jurisdictions sustaining the validity of the agree-

ment, and then says that the great weight of authority sustains the view that the agreement is contrary to public policy, citing many cases out of the state, and then continues:

"In the Supreme Court of this state we find, in addition to what has been held below in this case, a similar view taken by the General Term of the Second Department in Simpson v. New York Rubber Co., 80 Hun, 418, 30 N. Y. Supp. 339."

It would seem that, by quoting this case as authority for the proposition that such contracts are illegal, the Court of Appeals has recognized it as an authority upon the point decided by it, viz., that where the violation of duty by the defendant is a criminal act he cannot shield himself by alleging that the defendant had assumed the risk of his crime.

Reference is made to the law of 1902 and to chapter 657, p. 1682, of the Laws of 1906, as the more recent statutes intended for the protection of the employé, and as tending to show the policy of the state not to consider the employer and employé on an equality of contract, but rather that the employé must be protected from the dangers of the business which the employer reasonably ought to guard against. The latter statute is an amendment of the railroad law, and extends very materially the liability of the company to its employés for the negligence of its servants, and provides that no contract shall exempt or limit the liability of the corporation from the provisions of the act. The employer's liability act (chapter 600, p. 1748, Laws 1902) creates a new cause of action, by the first section, in favor of an injured employé who files the notice required by the second section. The third section provides in general terms that the risks of the employment "shall in all cases arising after this act takes effect" be considered as including only the risks inherent in the business after the employer has exercised due care in providing for the safety of his employés and has complied with the laws for the greater safety of such employés, and then continues: "In an action maintained for the recovery of damages for personal injuries to an employé received after this act takes effect," the fact that he continued in the service of the employer after the discovery of the danger shall not, as a matter of law, be considered as an assumption of the risk, or as negligence contributing to the injury, but that the question whether the employé understood and assumed the risk of such injury, or was guilty of contributory negligence, by his continuance in the same place and course of employment with knowledge of the risk of injury, shall be one of fact, subject to the usual powers of the court in a proper case to set aside a verdict rendered contrary to the evidence.

The statutes evidence the continued and progressive public policy of the state as recognizing the fact that the employé cannot take care of himself against the exactions of his employer, but that the state must protect him by legislation under its power to care for the health, safety, and welfare of its people. This third section of the employer's liability act is intended, in my judgment, to define the rights of the employer and the employé in all negligence cases arising thereafter. Such is the express language of the statute and its fair meaning. It

prevents in all negligence cases the direction of a verdict on the ground that the employé has assumed the risk, and leaves that question in the first instance solely for the jury. This section may authorize the jury to determine, even in a case where the master has violated the criminal law, that the employé has assumed such risk. The amendment to the railroad law, above referred to, would, however, seem to indicate that in those cases the defense of assumption of risk is never available. But these questions are not before us and are not determined.

I have fully discussed the application of section 3 of the employer's liability act (Laws 1902, p. 1750, c. 600) to all cases arising after the passage of the act, whether the notice provided for in the act is served or not, in a dissenting opinion in O'Neil v. Karr, 110 App. Div. 571, 97 N. Y. Supp. 148, and it is unnecessary to repeat here the reasons for such conclusion. That case went back for a new trial, and finally came before the Court of Appeals, where the judgment dismissing the complaint was affirmed without opinion. Goldman v. Goldberg, 190 N. Y. 509, 83 N. E. 1125. We must assume, however, that that court found some other ground upon which the case necessarily turned, as it is not probable that it decided without opinion one of the most important questions under this statute and under the negligence law of to-day, where this court was divided three to two, with an opinion upon each side, if in the judgment of the court that question was one upon which the case depended. I think, therefore, that the question is still open, and that the Court of Appeals has not determined that section 3 of the employer's liability act applies only to cases where notice has been served under that act.

I think we may properly refer to the changed public policy of the state since the Knisely Case, as evidenced by the decisions of the courts and the various statutes upon the subject, as tending to show that that case is not a correct declaration of the present public policy of the state with reference to the violation by the employer of the duties which the statute imposed upon him. But it is not necessary to refuse to follow that case, because, as we have seen, in that case the act omitted by the employer was not a criminal act, while in the case at bar the omitted act is declared criminal.

It follows, from these considerations: (1) That at common law, irrespective of the employer's liability act, it was a question of fact, to be determined by the jury in the first instance, whether the plaintiff understood and assumed the risk of the unguarded machinery. (2) That defendant may not protect itself from the injury caused by its crimes by an inference drawn by the court that the employé assumed the risk. (3) That section 3 of the employer's liability act applies to all actions of negligence where the injury occurred after the passage of the act, and that it is improper in such a case for the court to dismiss the complaint upon its determination that the plaintiff assumed the risk.

I therefore favor a reversal of the judgment.